# In the United States Court of Federal Claims

No. 05-626 V

(Filed June 16, 2014)[1]

```
* * * * * * * * * * * *    *
JESSIE CONTRERAS,          *
                           *
            Petitioner,    *    National Childhood Vaccine
                           *    Injury Act of 1986, 42 U.S.C.
      v.                   *    §§ 300aa-1 to -34 (2012); Lack
                           *    of Clarity in Credibility and
SECRETARY OF HEALTH AND    *    Reliability Determinations;
HUMAN SERVICES,            *    Remand.
                           *
            Respondent.    *
                           *
* * * * * * * * * * * *    *
```

*Jeffrey S. Pop*, Beverly Hills, CA, for petitioner.

*Linda S. Renzi*, United States Department of Justice, with whom were *Stuart F. Delery*, Assistant Attorney General, *Rupa Bhattacharyya*, Director, *Vincent J. Matanoski*, Deputy Director, *Voris E. Johnson, Jr.*, Assistant Director, Washington, DC, for respondent.

_____

## OPINION AND ORDER

_____

**BUSH**, *Senior Judge*

_____

[1]/ Pursuant to Rule 18(b) of Appendix B of the Rules of the United States Court of Federal Claims, this Opinion and Order was initially filed under seal on May 19, 2014. Pursuant to ¶ 4 of the ordering language, the parties were to propose redactions of the information contained therein on or before June 6, 2014. No proposed redactions were submitted to the court.

Now pending before the court is petitioner's motion for review of the special master's decision on remand, *see Contreras v. Sec'y of Health & Human Servs.*, No. 05-626V, 2013 WL 6698382 (Fed. Cl. Spec. Mstr. Nov. 19, 2013) (*Contreras III*),[2] which denied Jessie Contreras's petition for compensation under the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa-1 to -34 (2012) (the Vaccine Act).[3]  Although petitioner attacks the special master's decision on many fronts, a threshold issue regarding the credibility of one of respondent's experts and the reliability of that expert's opinions prevents this court from reaching the remainder of petitioner's arguments.  Pet.'s Mot. at 2, 4-5; Resp.'s Resp. at 27-29.  Because the credibility and reliability determinations of the special master regarding this particular expert are unclear, and because the extent of the special master's reliance on the opinions of this expert for the entitlement decision is similarly unclear, the court must remand this case to the special master.

## BACKGROUND

### I.    Factual History

Prior decisions in this case provide ample factual background for Jessie's alleged vaccine injury of transverse myelitis (TM) and Guillain-Barré Syndrome (GBS).  *See, e.g.*, *Contreras v. Sec'y of Health & Human Servs.*, 107 Fed. Cl. 280 (2012) (*Contreras II*); *Contreras v. Sec'y of Health & Human Servs.*, No. 05-626V, 2012 WL 1441315 (Fed. Cl. Spec. Mstr. Apr. 5, 2012) (*Contreras I*), *vacated*, 107 Fed. Cl. 280.  The alleged injury occurred in 2003, approximately twenty-four hours after Jessie received inoculations containing the Hepatitis B vaccine (HepB) and tetanus-diptheria vaccine (Td).  Jessie is now twenty-four years old.

### II.    Procedural History

---

[2]/  The court cites not to the Westlaw version of the special master's opinion on remand, but follows the practice of the parties and cites to the opinion version (Opin.) available on this court's website.

[3]/  Hereinafter the court will refer to Mr. Contreras as "petitioner" or "Jessie," because he was thirteen years old at the time of his alleged vaccine injury.

On June 15, 2005, Jessie's father, acting for Jessie, filed a petition under the Vaccine Act.  Petitioner initially engaged Dr. Charles M. Poser, M.D. as an expert.  Respondent then engaged Dr. John T. Sladky, M.D. to opine on causation.  Dr. Sladky's initial report in 2005 was filed in response to Dr. Poser's report.  *See* Ex. I; *see also* Resp.'s Resp. at 27.

Petitioner then engaged another expert, Dr. Lawrence Steinman, M.D.  Dr. Steinman's initial report was filed in 2006.  A few years later, Dr. Sladky filed a second report to respond to Dr. Steinman's report.  *See* Resp.'s Resp. at 27.  Dr. Sladky's second report was filed on March 8, 2010 and re-filed on March 22, 2010.  *See* Ex. P.  Respondent had also engaged a second expert, Dr. J. Lindsay Whitton, M.D., Ph.D., who also responded to Dr. Steinman's contentions.  Drs. Steinman, Sladky and Whitton testified at the first evidentiary hearing in this case, held April 19-20, 2010.[4]

In *Contreras I*, the special master denied petitioner entitlement to compensation under the Vaccine Act.  In *Contreras II*, this court vacated that opinion and remanded the case to the special master for a revised causation analysis.  In *Contreras III*, the special master issued a revised causation analysis which again denied petitioner entitlement to compensation.  Before the special master issued his decision, however, on May 1, 2013 the Secretary filed a status report revealing previously undisclosed information regarding Dr. Sladky.  It is the special master's ambiguous response to that disclosure of information that is the primary focus of this opinion.

## DISCUSSION

### I.   Standard of Review

This court has jurisdiction to review the decision of a special master in a Vaccine Act case.  42 U.S.C. § 300aa-12(e)(2).  "Under the Vaccine Act, the Court of Federal Claims reviews the decision of the special master to determine if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]'"  *de Bazan v. Sec'y of Health & Human Servs.*, 539 F.3d 1347, 1350 (Fed.

---

[4]/  All citations to the transcript (Tr.) in this opinion are to the transcript of the 2010 hearing.

Cir. 2008) (quoting 42 U.S.C. § 300aa-12(e)(2)(B) and citing *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1277 (Fed. Cir. 2005)) (alteration in original).  This court uses three distinct standards of review in Vaccine Act cases, depending upon which aspect of a special master's judgment is under scrutiny:

> These standards vary in application as well as degree of deference.  Each standard applies to a different aspect of the judgment.  Fact findings are reviewed . . . under the arbitrary and capricious standard; legal questions under the "not in accordance with law" standard; and discretionary rulings under the abuse of discretion standard.

*Munn v. Sec'y of Dep't of Health & Human Servs.*, 970 F.2d 863, 870 n.10 (Fed. Cir. 1992).

     The third standard of review, abuse of discretion, is applicable when the special master excludes evidence or otherwise limits the record upon which he relies.  *See id.*  As this court has stated, the third standard applies to evidentiary rulings, including those regarding the qualifications of an expert:

> Notably, such [discretionary] rulings include determinations regarding the qualification of expert witnesses and the reliability of expert testimony. *Piscopo v. Sec'y of Health & Human Servs.*, 66 Fed. Cl. 49, 53 (2005); *see* [*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142-43 (1997)] (holding that "abuse of discretion is the proper standard of review of a [trial] court's evidentiary rulings," including determinations regarding the reliability of expert testimony under [*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993))]; [*Terran ex rel. Terran v. Sec'y of Health & Human Servs.*, 195 F.3d 1302, 1316 (Fed. Cir. 1999)] (reviewing for abuse of discretion the Special Master's decision to reject as unreliable the testimony of the petitioner's expert).  Determinations subject to review for abuse of discretion must be sustained unless "manifestly

> erroneous." *Piscopo*, 66 Fed. Cl. at 53; *see Milmark Servs., Inc. v. United States*, 731 F.2d 855, 860 (Fed. Cir. 1984) (holding that decisions that lie within the trial court's discretion are to be sustained unless "manifestly erroneous").

*Jarvis v. Sec'y of Dep't of Health & Human Servs.*, 99 Fed. Cl. 47, 59 (2011). Thus, a special master's determination as to the reliability of expert witness testimony is reviewed under the abuse of discretion, or manifestly erroneous, standard. *Terran*, 195 F.3d at 1316 (citing *Burns v. Sec'y of Dep't of Health & Human Servs.*, 3 F.3d 415, 416-17 (1993)); *Milmark*, 731 F.2d at 860 (citing *Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962)).

On the particular topic of a fact-finder's determination as to the credibility of a testifying witness, the United States Court of Appeals for the Federal Circuit has often stated that such determinations are "'virtually unreviewable.'" *E.g.*, *Bradley v. Sec'y of Dep't of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993) (citing *Hambsch v. Dep't of Treasury*, 796 F.2d 430, 436 (Fed. Cir. 1986)). The court has found no authority, however, which states that a credibility determination is immune from review, particularly where, as here, extrinsic evidence has subsequently been disclosed which shows a lack of candor on the part of an expert witness. For this reason, the court reviews the special master's determinations regarding Dr. Sladky's credibility and the reliability of Dr. Sladky's expert opinions for manifest error. Unfortunately, the special master's determinations in this regard are ambiguous and resist review absent further clarification.

## II.   Analysis

### A.   Dr. Sladky's Opinions and Testimony Have Been Undermined By a Consistent Pattern of Misrepresentations to the Court and to Respondent's Counsel

#### 1.   An Undisclosed History of Substance Abuse

On May 1, 2013, the Secretary was obliged to disclose that Dr. Sladky, one of the two experts employed by respondent in this case, had a substance abuse

problem which led to the suspension and probationary restoration of his license to practice medicine at or around the time he was drafting an expert report and testifying at the 2010 hearing in this case.[5]  Some excerpts of this disclosure reveal that

> the Secretary and respondent's counsel have only recently learned . . . that Dr. Sladky agreed not to practice medicine in the state of Georgia from August 19, 2008 to March 18, 2009, and agreed to the indefinite suspension of his license to practice medicine on June 17, 2009, and that on March 4, 2010, the suspension of his license was lifted and his license to practice restored on a probationary basis.  The probation was terminated on July 5, 2011. . . .  Neither the Secretary nor respondent's counsel was aware of the suspension or probationary status of Dr. Sladky's license prior to or at the time he provided the expert witness services in this case.

Status Report of May 1, 2013, at 1.

Attached to the Secretary's status report were a number of documents issued by the State of Georgia's Composite State Board of Medical Examiners (Board), the earliest of which, dated June 17, 2009, provides an initial insight into Dr. Sladky's alcohol dependence:

> On or about June 5, 2009, the Board received reliable information from Talbott Recovery Campus ("TRC") that Respondent [Dr. Sladky] tested positive for alcohol in a urine drug/alcohol screen and, as a result, TRC recommends that Respondent enter inpatient treatment at TRC immediately.

*Id.* at 14.  This report of a failed urine test was just one manifestation of Dr.

---

[5]/ Dr. Sladky signed his second expert report on March 4, 2010, provided the report to respondent's counsel by March 8, 2010, and testified in this case on April 20, 2010.

Sladky's substance abuse problem and was the trigger for the Board's disciplinary action which included:  (1) the indefinite suspension of Dr. Sladky's license to practice medicine on June 17, 2009, (2) the requirement that he receive inpatient treatment for his condition, and, (3) that he attend continuing care after treatment as required by the rehabilitation center's staff.  There were, however, earlier incidents that led to this and other disciplinary action by the Board.

As recounted in a later Board decision dated March 4, 2010,

> [o]n or about August 19, 2008, Respondent [Dr. Sladky] was evaluated and treat[ed] for alcohol dependence at Ridgeview Institute ("Ridgeview").  Respondent notified the Board that he was in treatment and agreed not to return to the practice of medicine without the written express permission of the Board.  Respondent completed treatment and was discharged on or about November 19, 2008.

Status Report of May 1, 2013, at 4.  Dr. Sladky was permitted to return to the practice of medicine on March 18, 2009.  That return to practice was short-lived, however, because

> [s]oon after his return to practice, Respondent [Dr. Sladky] had several positive urine tests for ethyl glucuronide, in violation of both his monitoring agreement with Ridgeview and the terms of his Board Order [of March 18, 2009].

*Id.* at 5.

Accepting the Board's disciplinary actions in June 2009,

> Respondent [Dr. Sladky] entered the Talbott Recovery Campus ("TRC") program on June 9, 2009 . . . .  After completing inpatient treatment on July 31, 2009, Respondent then entered and completed intensive outpatient treatment, followed by aftercare.

7

*Id.* As of March 4, 2010, Dr. Sladky's petition to lift the suspension of his medical license was granted.

Dr. Sladky, however, was only granted a probationary license to practice medicine, under the supervision of a physician at his place of employment to monitor Dr. Sladky's work, and under the supervision of a different physician to monitor Dr. Sladky's treatment for alchoholism and his use of prescription medications, if any. This probation also included a number of conditions, such as: substance abuse treatment, including weekly group therapy sessions; participation in a support group such as Alcoholics Anonymous, including the requirement that he obtain a sponsor so that he could "work a daily recovery program"; unscheduled drug and alcohol screening tests; and, initial and quarterly reports from both his workplace supervising physician and his substance abuse treatment physician. *Id.* at 6-8. According to the Board's order of March 4, 2010, Dr. Sladky would not "be eligible to petition for termination of probation until five (5) years of continuous sobriety from the effective date of this Consent Order." *Id.* at 11.

More than three and a half years before Dr. Sladky was due, at the earliest, to become eligible to petition for the termination of his probation pursuant to the Board's order of March 4, 2010, the Board terminated the probation conditions on Dr. Sladky's license to practice medicine in the State of Georgia, with no substantive commentary. Status Report of May 1, 2013, at 3. The record before the court does not show how the Secretary learned of: (1) Dr. Sladky's undisclosed substance abuse problem; (2) the first agreement that he not practice medicine; (3) the second and indefinite suspension of his license to practice medicine; and, (4) the probation conditions imposed upon his license by the State of Georgia's Composite State Board of Medical Examiners. What is clear from the record is that Dr. Sladky was not candid about the events chronicled here with either respondent's counsel or the court. What is also clear is that petitioner was deprived of any opportunity to elicit testimony from Dr. Sladky as to the actual conditions of his medical practice because Dr. Sladky's *curriculum vitae* misrepresented the state of his medical licensure *at all times* relevant to this litigation.

      **2.**      **A Pattern of Misrepresentation in the *Curriculum Vitae* Dr. Sladky Submitted in This and Other Cases**

### a.   Dr. Sladky's *Curriculum Vitae* in This Case

Dr. Sladky's *curriculum vitae* (CV) was submitted by respondent along with his first expert report on October 27, 2005, and, pursuant to the special master's instructions, was refiled as Exhibit J on December 2, 2005 to clarify the docket. The CV was dated "May 1, 1999," even though it was submitted to the court six years after that date, and contained information that referenced responsibilities of Dr. Sladky extending to the year 2002. Ex. J at 5. Under the rubric "Licensure," Dr. Sladky's CV identified a license to practice medicine in Pennsylvania (No. MD-022838-E).[6] *Id.* at 3. Respondent does not dispute that Dr. Sladky's Pennsylvania license expired in 1996, well before the "May 1, 1999" date on the CV, and almost ten years before Dr. Sladky's CV was filed in this case. In the court's view, Dr. Sladky's CV, bearing no notation that his license in Pennsylvania had expired, misrepresented Dr. Sladky's credentials. Thus, the expert report filed by Dr. Sladky in 2005 was supported by an inaccurate and misleading CV.

As the special master and the parties prepared for the 2010 hearing in this case, almost five years after respondent had first filed Dr. Sladky's CV, respondent's counsel informed the special master and petitioner that

> respondent intends to call John Sladky, M.D., to testify at hearing. As of the filing of this status report, Dr. Sladky has indicated that he is making efforts to appear in person if possible, but will be available by phone, if necessary. Dr. Sladky is preparing a supplemental expert report to address the issues raised by petitioner's expert, Dr. Steinman. Respondent will file Dr. Sladky's report, an updated *curriculum vitae*, and referenced medical articles, no later than March 8, 2010.

Status Report of January 27, 2010, at 1 (emphasis added). No updated CV was filed by respondent.

---

[6]/ Dr. Sladky's license number in Pennsylvania, MD-022838-E, should not be read to include a designation "E" for "expired." Active and expired medical licenses in that state may bear the "E" designation.

The court notes that as of January 27, 2010, Dr. Sladky's license to practice medicine in Georgia was suspended and his license in Pennsylvania had expired many years before.  The following evidence shows that Dr. Sladky was working on his second expert report while his sole "active" license to practice medicine (in Georgia) was suspended and before his suspended license (in Georgia) was reinstated (with probationary conditions) on March 4, 2010:  (1) respondent's counsel's statement on January 27, 2010 that Dr. Sladky "is preparing" his second expert report; (2) the detailed analysis of Dr. Steinman's opinions in Dr. Sladky's second expert report; and, (3) the date marked on Dr. Sladky's expert report, March 4, 2010, which was filed by respondent on March 8, 2010 (lacking a signature) and refiled (with a signature) on March 22, 2010.  *See* Ex. P.  Thus, Dr. Sladky's first expert report was supported by an inaccurate and misleading CV as to licensure in Pennsylvania, and Dr. Sladky's second expert report was again supported by an inaccurate and misleading CV as to licensure in Pennsylvania. Furthermore, his inaccurate and misleading CV failed to disclose that the second expert report had been composed, at least in part, while Dr. Sladky's license to practice medicine in Georgia was suspended, and failed to disclose that the report was signed when his license to practice medicine was subject to probationary conditions.

There is no information in the record which explains why respondent never filed an updated CV for Dr. Sladky to accompany his second expert report, as promised in the January 27, 2010 status report.  The court believes that a party in a vaccine injury case has a duty to update or supplement inaccurate information in the record before the special master.  *See Erve by Erve v. Sec'y of Health & Human Servs.*, 39 Fed. Cl. 607, 616 (1997) (discussing the obligations of litigants in vaccine cases to disclose relevant evidence, in light of the informal and cooperative discovery procedures used in these cases).  Here, Dr. Sladky's inaccurate CV prevented the special master and petitioner from ascertaining the true nature of Dr. Sladky's medical practice and credentials at the times he opined as an expert in this case.

### b.    Dr. Sladky's *Curriculum Vitae* in Other Vaccine Cases before This Court

Dr. Sladky, to the court's knowledge, has never submitted an accurate CV in the numerous vaccine cases for which he was engaged by the Secretary as an

10

expert.  To cite perhaps the most egregious example of a misleading CV provided by Dr. Sladky, the court turns to *Crosby v. Sec'y of Health & Human Servs.*, No. 08-799V (Fed. Cl. filed Nov. 10, 2008).  The petition in that case was filed on November 10, 2008, during a time when Dr. Sladky was not permitted to practice medicine due to his substance abuse problem.  As of September 29, 2009, respondent's counsel in that case noted that Dr. Sladky "has indicated that he requires additional time to complete his review and prepare a report in this case." *Crosby* Status Report of Sept. 29, 2009, at 1.  Dr. Sladky's license to practice medicine, as of September 29, 2009 when he was producing the expert report in *Crosby*, was suspended due to his substance abuse problem.

Dr. Sladky's expert report in *Crosby* was signed on October 26, 2009, when his license to practice medicine was still suspended due to his alcohol dependence. The CV that supported that expert report, dated "May 1, 2005" but filed November 2, 2009, asserts under "Licensure" that Dr. Sladky is licensed in both Pennsylvania and Georgia, although in truth he could not practice medicine in either state at the time his report and CV were filed.  *Crosby* Notice of Filing of November 2, 2009, Ex. A Tab 1 at 3.  Respondent won that case, at least in part, because "[b]oth parties presented *well credentialed experts*" and respondent's experts, including Dr. Sladky, were found to be more persuasive by the special master.  *Crosby v. Sec'y of Health & Human Servs.*, No. 08-799V, slip op. at 2 (Fed. Cl. Spec. Mstr. June 20, 2012) (emphasis added).  Respondent did not file a status report in that case disclosing the Secretary's discovery of Dr. Sladky's undisclosed substance abuse problem, licensure difficulties and lack of candor.[7]

To cite only a few more examples, Dr. Sladky's pattern of submitting inaccurate CVs in vaccine cases cannot be described as anything other than consistent.  In Case No. 09-293V, on April 22, 2011 respondent filed a "January 5, 2009" version of Dr. Sladky's CV, asserting "Licensure" in Pennsylvania (although that license had expired approximately twelve years before the date of the CV) and "Licensure" in Georgia (although that license was suspended as of the date of the CV).  In Case No. 08-763V, on May 24, 2010 respondent filed a "May 1, 2005" version of Dr. Sladky's CV, asserting "Licensure" in Pennsylvania

---

[7]/ The court assumes this failure to disclose relevant information was inadvertent, because the Secretary was diligent in filing status reports in other vaccine cases for which Dr. Sladky was retained as an expert, whether or not those cases were open or closed.

(although that license had expired more than eight years before the date of the CV).  In Case No. 10-717V, on September 30, 2011 respondent filed a "May, 2011" version of Dr. Sladky's CV, which continued to assert "Licensure" in Pennsylvania (although that license had expired over fourteen years before the date of the CV).

The court believes that it is wrong to assume that the submission of consistently inaccurate CVs was inadvertent or the product of laziness on Dr. Sladky's part.  He obviously was updating his CV throughout this period by changing the date on the first page of the document (although that date never appears to have matched the date of the expert report it supported).  He also was, in some instances, adding recent publications to his CV.  Furthermore, it is clear from the *Crosby* case, in particular, that Dr. Sladky had an updated, if inaccurate, CV dated "May 1, 2005" that was available to be filed by respondent on November 2, 2009 in that case, but which was *not* filed in early 2010 in this case, as promised by respondent's counsel.  The court cannot minimize the misrepresentations in the CVs Dr. Sladky has submitted in vaccine cases,[8] and notes that Dr. Sladky was removed as an expert from at least one vaccine case (which later settled).  *See* Resp.'s May 17, 2013 Status Report, *Covin by Strand v. Sec'y of Health & Human Servs.*, No. 08-763V (Fed. Cl. closed Mar. 31, 2014).

### 3.      Three Examples of Misleading or Incomplete Testimony Regarding Dr. Sladky's Medical Practice

#### a.      Dr. Sladky's Testimony in This Case

There is no indication that Dr. Sladky perjured himself on April 20, 2010 in the evidentiary hearing before the special master in this case.  He did not state, and was not asked to state, whether he was licensed to practice medicine in Pennsylvania and Georgia.  He was not asked whether his license to practice medicine was on probation (which it was at the time he testified), and he was not asked whether he had been subject to disciplinary proceedings which led to the

---

[8]/ The special master commented that "it is difficult to say" whether the representations as to licensure in Pennsylvania on Dr. Sladky's CV were "due to forgetfulness or due to intent." Opin. at 7.  That may be true when this case is viewed in isolation.  It is harder to attribute the inaccuracies in Dr. Sladky's CV to forgetfulness when one considers that Dr. Sladky exhibited a lack of candor regarding his licensure problems in multiple vaccine cases.

suspension of his license.  There is also no indication that his employment status as "senior faculty" in the Department of Pediatric Neurology at Emory University School of Medicine was misrepresented.  Tr. at 275.

The court notes, however, that the testimony of Dr. Sladky was founded on the CV respondent submitted on December 2, 2005.  *See* Tr. at 278; Ex. J.  As noted *supra*, that CV, for which an updated version was never proffered, asserted licensure in Pennyslvania.  That "May 1, 1999" CV also stated that Dr. Sladky was Chief of the Division of Pediatric Neurology at Emory, under the rubric "Hospital Appointments."  Ex. J at 3.  Whether that hospital appointment was still in place when Dr. Sladky testified is unclear.  In the court's view, Dr. Sladky's testimony, like his CV, failed to fully represent the existing state of his credentials and the existing conditions of his medical practice, as is further evidenced below.

In general terms, Dr. Sladky testified that "I see patients," that "I see patients every week," and that "[I] attend on the inpatient neurology service roughly three months a year, a little less."  Tr. at 275.  He described his work as a "[p]retty standard, busy clinical and academic lifestyle."  *Id.*  More specifically, Dr. Sladky testified that "probably half" of his working hours are devoted to clinical time, and that "I see patients every week, usually five half days a week, probably average 40-50 patients a week."  *Id.*

This testimony by Dr. Sladky was provided on April 20, 2010, forty-seven days after he was permitted to return to the practice of medicine in Georgia.  If the court were to consider the two-year period of time leading up to this testimony, Dr. Sladky was only licensed to practice medicine for eight and a half of those twenty-four months, and more than one month of the time that he *was* licensed to practice medicine during that period was under supervised probation.  When this factual context is considered, Dr. Sladky's testimony that he sees patients every week; that probably half of his working hours are clinical time; that he attends on inpatient service a little less than three months a year; and that he probably averages 40-50 patients a week, is misleading.

Whether Dr. Sladky was attempting to describe his recently restored medical practice that resumed on March 4, 2010, aptly using the present tense, or whether Dr. Sladky was attempting to paint an impressionistic picture of his long-term tenure at Emory, imprecisely using the present tense, the description of his

13

medical practice that he provided the special master and opposing counsel in his
testimony cannot be reconciled with the interruptions in his medical practice
caused by his substance abuse and licensure problems.  Like his inaccurate CV,
Dr. Sladky's testimony is misleading as to his experience and qualifications to
testify as an expert.  Unfortunately, the hearing in this vaccine case is not the only
time that Dr. Sladky's testimony glossed over and hid the fact that he was
prevented from practicing medicine for fifteen and a half months between 2008
and 2010, and that his license to practice medicine was on probation for over a
year in 2010 and 2011.

   **b.     Dr. Sladky's Testimony in Other Vaccine Cases
           before This Court**

   Only two special masters, besides the special master presiding over this
case, have commented on the hearing testimony of Dr. Sladky once his lack of
candor was disclosed by the Secretary.  In *Roberts v. Sec'y of Health & Human
Servs.*, No. 09-427V, 2013 WL 5314698, at *9 (Fed. Cl. Spec. Mstr. Aug. 29,
2013), the special master noted that Dr. Sladky had been on a probationary license
to practice medicine when he submitted his expert reports in that case.  Although
Dr. Sladky's hearing testimony in *Roberts* was provided after that probationary
period had terminated, the special master was troubled by Dr. Sladky's lack of
candor, noting that "in discussing his qualifications at the hearing, no mention was
made of [licensure suspension problems] and such information was glossed over."
*Id.*

   In *Raymo v. Sec'y of Health & Human Servs.*, No. 11-654V, 2014 WL
1092274, at *14 (Fed. Cl. Spec. Mstr. Feb. 24, 2014), the special master noted,
first, that Dr. Sladky "was properly licensed throughout his involvement with
th[at] case."  Nonetheless, the special master observed that the CV provided by Dr.
Sladky in *Raymo*, dated "January 5, 2009," was inaccurate:

          I looked carefully at the testimony of Dr. Sladky and his
          CV, filed as Res. Ex. B.  Although filed with his expert
          report in February 2012, his CV is dated January 5,
          2009.  His CV therefore was written or updated near the
          end of the period during which Dr. Sladky had agreed
          not to practice medicine.  However, Dr. Sladky's CV

14

does not reflect that he had taken leave from his hospital
appointments.

*Id.* at *15 (citation omitted).  The special master then turned to the testimony
provided by Dr. Sladky as to his qualifications as an expert:

> Doctor Sladky was . . . careful . . . to avoid perjuring
> himself.  He testified that he began working at Emory
> University in 1995 and had recently retired and moved to
> a private practice in Atlanta.  He did not mention that
> between 1995 and 2012 there were periods when he had
> a suspended medical license or practiced only on a
> probationary basis.  When asked to describe his
> day-to-day activities while at Emory and in his current
> position, he carefully prefaced his answer with "when I
> was on service."  This preface could reflect the
> difference in his roles when performing medical duties
> versus his administrative or teaching duties.
> Alternatively, it could be considered a carefully crafted
> answer to avoid giving perjured testimony.  By
> specifying that his answer pertained to the time periods
> when he was practicing medicine, he avoided the
> necessity of indicating that there were periods when he
> was not able to practice medicine due to the suspension
> of his medical license.

*Id.* (citations omitted).

This special master, too, was troubled by Dr. Sladky's avoidance of the
topic of his licensure problems.  The following passage reflects the special
master's conclusions as to the misleading nature of the testimony provided by Dr.
Sladky:

> I administer an oath to witnesses that requires that they
> tell the whole truth.  Neither . . . nor Dr. Sladky told the
> whole truth.  Both demonstrated a lack of candor that,
> although not related directly to the substance of their

> causation opinions, reflect[s] their willingness to, at the
> very least, shade the truth. . . .  In the case of Dr. Sladky,
> it appears that he so feared the loss of his position and
> income as a case reviewer for respondent that he
> withheld facts concerning his medical license
> suspension.

*Id.* at \*16.  Thus, in both *Roberts* and *Raymo*, Dr. Sladky's testimony was viewed
in a negative light because of his misleading statements regarding his medical
practice and qualifications to opine as an expert.

### 4.  Credibility and Reliability Determinations in Other Vaccine Cases Based on Dr. Sladky's Lack of Candor

The credibility and reliability determinations regarding the overall value of
Dr. Sladky's opinions in *Roberts* and *Raymo* are not exactly the same.  In *Roberts*,
the special master merely noted that Dr. Sladky's representations regarding his
qualifications were "questionable," and that the recently revealed information
about his licensure problems gave her "pause."  2013 WL 5314698, at \*9.  Her
conclusion regarding his opinions, based on the candor issue as well as the
substantive content of his opinions, was that she "d[id] not find Dr. Sladky's
testimony as reliable and persuasive as the testimony of [two of the petitioners'
experts]."  *Id.*

In *Raymo*, on the other hand, Dr. Sladky's credibility was destroyed by his
lack of candor regarding his licensure problems.  The special master considered
not only Dr. Sladky's lack of candor in the case before her, but also his lack of
candor in other vaccine cases:

> Standing alone, the basis for Dr. Sladky's disciplinary
> action might not affect the reliability of his expert
> opinions.  However, his failure to disclose the
> disciplinary action to respondent, his authoring of expert
> opinions while he did not have an active medical license,
> and the failure to reflect his voluntary leave from
> medical practice due to a substance abuse problem on the
> CV filed in this case all cast doubt about his credibility

16

as a witness.

*Raymo*, 2014 WL 1092274, at *15.  She therefore did not rely at all on the opinion of Dr. Sladky for her entitlement decision in that case.

It is perhaps noteworthy that petitioners in both *Roberts* and *Raymo* prevailed on entitlement, at least in part because the expert opinion of Dr. Sladky was of lessened or no value to respondent's arguments in those cases.  *Raymo*, 2014 WL 1092274, at *17 ("Because I attach no weight to the opinions of Drs. Sladky and . . . , [petitioners' expert's] opinion is largely unrebutted."); *Roberts*, 2013 WL 5314698, at *11 (basing her decision regarding entitlement on the special master's "review of the evidence and an assessment of the reliability of the opinions of the various expert witnesses").

### B.      The Special Master's Assessment of Dr. Sladky's Credibility and Reliability in This Case

The special master's ruling on the credibility and reliability of Dr. Sladky, rendered after the parties hotly contested the importance of the Secretary's disclosures, is ambiguous.  In the section of the opinion devoted to Dr. Sladky's credibility and reliability as an expert, the special master states:

> The Secretary does not dispute that Dr. Sladky should have disclosed the information concerning his health issues and the effect they had on his ability to practice medicine.  The failure to disclose this important information bears on his credibility and reliability as an expert witness.
> However, the lack of disclosure and (implicit) misrepresentation about qualifications does not entirely negate Dr. Sladky's opinion.  Dr. Sladky established his opinion almost three years before his license was suspended and it has not changed throughout the course of these proceedings.  As the Secretary asserted, it does not appear that Dr. Sladky's personal health issues or his licensure problems affected his opinions in any way.  In addition, Dr. Sladky's opinions are consistent with the

17

> opinions of other witnesses.  This corroboration shows
> that Dr. Sladky's opinions retain some value.

Opin. at 7 (citations and footnote omitted).  A later comment on the credibility and
reliability of Dr. Sladky is presented in a footnote:

> The [causation] analysis in the text does not rely upon
> Dr. Sladky's opinion extensively.  Thus, under the
> circumstances in which the Secretary presented the
> opinion of a different doctor, the problems in Dr.
> Sladky's licensing and the non-disclosure of these
> problems ha[ve] minimal effect on this case.

*Id.* at 71 n.51.

### 1.    Minimizing the Importance of Dr. Sladky's Misrepresentations and Misleading Testimony for Credibility and Reliability Determinations

The court observes, first, that the special master appears to dismiss Dr.
Sladky's substance abuse problem and lack of candor as relatively unimportant.
*See* Opin. at 71 n.51; *see also supra* note 8.  The special master notes, for example,
that Dr. Sladky never saw Jessie as a patient, and comments that petitioner did not
establish "that a suspension of a license to practice medicine means that the person
may not provide opinions based upon the person's training and experience."
Opin. at 6.  The more salient issue, in the court's view, is whether a physician
engaged as an expert by the Secretary should have revealed to respondent's
counsel that his expert report was created, at least in part, during a time period
when the physician's license to practice medicine was suspended.

At this late date, it may not be helpful to inquire whether the special
master's assumptions regarding the severity and duration of Dr. Sladky's
substance abuse problem are correct.  *See* Opin. at 7 ("Dr. Sladky established his
opinion almost three years before his license was suspended and it has not
changed throughout the course of these proceedings.  As the Secretary asserted, it
does not appear that Dr. Sladky's personal health issues or his licensure problems
affected his opinions in any way.").  The court cannot ignore, however, the fact

that the special master improperly conflated Dr. Sladky's 2005 expert report with his 2010 expert report and hearing testimony, in a manner that minimizes Dr. Sladky's credibility problems:

> [T]he lack of disclosure and (implicit) misrepresentation about qualifications does not entirely negate Dr. Sladky's opinion.  Dr. Sladky established *his opinion* almost three years before his license was suspended and it has not changed throughout the course of these proceedings.

Opin. at 7 (emphasis added).  Dr. Sladky provided more than one *opinion* in this case, as the record clearly shows.

At the time of the filing of Dr. Sladky's first report, petitioner's expert Dr. Steinman had not yet opined on causation and the subsidiary issues relevant to causation.  Dr. Sladky's second expert report is not a carbon copy of his first report – it was filed "to address the issues raised by petitioner's expert, Dr. Steinman."  Resp.'s Status Report of January 27, 2010, at 1; *see* Tr. at 279 (direct examination confirming that Dr. Sladky's second report, Ex. P, "was in response to Dr. Steinman's report"); Ex. P at 1 ("I have been asked to comment on supplementary opinions which have been provided to this court regarding the above referenced matter.  I have not previously reviewed these documents as they were submitted after I prepared my initial report in 2005.").

Dr. Sladky's *opinions* on many issues considered by the special master were presented in his second expert report or later at the hearing; it cannot be said that Dr. Sladky's sole opinion was presented first in 2005 and never changed thereafter.  To the extent that a specific Dr. Sladky opinion disagrees with a specific proposition advanced by Dr. Steinman in this case, Dr. Sladky's opinion is necessarily of a 2010 vintage, not a 2005 vintage.  *See* Tr. at 321-22 (noting that he had only worked on this case, after 2005, not long "before we came here [for the 2010 hearing]").  To obtain some of these 2010 vintage opinions, Dr. Sladky was cross-examined about his second report, which was signed and filed in 2010.  *Id.* at 353.  He was also examined as to his (2010 vintage) view of certain opinions

of Dr. Steinman.  *Id.* at 371-72, 381-82, 389-90, 396, 402-03.[9]  Therefore, it cannot be said that Dr. Sladky's *opinion* did not change or was consistent after 2005.

In the court's view, the proposition that Dr. Sladky's supposedly "reliable" 2005 opinions somehow validate later opinions tainted by a documented substance abuse problem, disciplinary actions preventing him from practicing medicine, and a lack of candor, is flawed.  Dr. Sladky's hearing testimony, it should be noted, contains *some* consistent opinions but also contains *some* newly-proffered opinions, and these 2010 vintage opinions were considered by the special master in his decision.[10]  The body of Dr. Sladky's oral testimony, which was highly-detailed and went far beyond the analysis presented in his five-page 2005 expert report, must largely stand or fall based on Dr. Sladky's credibility *when he was testifying* in 2010.

The only other flaw in the special master's analysis of the "credibility and reliability" of Dr. Sladky worth noting is that of an illogical reliance on "corroboration."  Opin. at 7.  Dr. Sladky's opinions retain some value, according to the special master, because

> Dr. Sladky's opinions are consistent with the opinions of other witnesses.  This corroboration shows that Dr. Sladky's opinions retain some value.

*Id.* (footnote omitted).  One could interpret this statement as suggesting that the fact-finder may abdicate his role as the assessor of credibility of expert witnesses whenever the witness in question offers statements that are in harmony with

---

[9]/  These transcript citations are limited to instances where Dr. Steinman was mentioned by name.  There are other examples in Dr. Sladky's testimony where propositions advanced by Dr. Steinman were referenced but his name was not.

[10]/  To cite one example, Dr. Sladky's opinion regarding the significance of a certain reflex test was cited by the special master.  Opin. at 11 n.6, 28.  That particular Dr. Sladky opinion was not presented in 2005.  *See* Ex. I.  Although certain opinions, such as Dr. Sladky's opinion regarding the timing of the onset of Jessie's disease, did not evolve in any substantive way, many other Dr. Sladky opinions were disclosed or refined in 2010.

statements from other expert witnesses.[11]

Such a practice would avoid making credibility determinations in the first instance and would proceed directly to the weighing of available evidence without first determining whether that evidence is reliable.  This approach violates binding precedent which requires special masters to assess the credibility, in appropriate instances, of expert witnesses:

> Finders of fact are entitled – indeed, *expected* – to make determinations as to the reliability of the evidence presented to them and, if appropriate, as to the credibility of the persons presenting that evidence. . . .
>
> In this case, the special master applied the correct legal standard and found, based in part on the unconvincing nature of the expert evidence and the *lack of credibility of the petitioners' expert*, that the petitioners failed to prove causation by a preponderance of the evidence.

*Moberly ex rel. Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1326 (Fed. Cir. 2010) (emphasis added).  If there has ever been an appropriate instance in a Vaccine Act case where a special master must first assess the credibility of an expert witness, Dr. Sladky's testimony and opinions provide that circumstance.  In the court's view, before the special master can assess whether Dr. Sladky's opinions are convincing or persuasive, he must first determine whether or not Dr. Sladky is a credible witness providing reliable opinions.

---

[11]/  An additional weakness in the special master's reliance on the "corroboration" of Dr. Sladky's opinions is the special master's imprecise characterization of this corroboration as corroboration provided by "other witnesses."  Opin. at 7 & n.4.  The corroboration for Dr. Sladky's diagnosis of Jessie's illness, for example, is provided not by any testifying witness, affidavit or declaration, but by the special master's interpretation of excerpts from Jessie's medical records.  *See* Pet.'s Mot. at 16 ("None of these four physicians [upon whose commentary in Jessie's medical records the special master relied] provided any written opinions to be considered or testimony at the hearing."); Opin. at 7 n.4 ("Dr. Sladky's opinion matches the diagnosis of Mr. Contreras's treating neurologist [who did not testify at the hearing or provide a declaration]."), 25-26 (citing medical records found in Exs. 7, 82), 29-30 & nn.23-24 (citing medical records found in Ex. 7).

###       2.      Lack of Clarity as to the Assessment of Dr. Sladky's
                  Credibility and Reliability

The court has attempted to reconcile the special master's statements regarding Dr. Sladky's credibility and reliability.  These statements include: (1) "Dr. Sladky's opinions retain some value"; (2) "The analysis in the text does not rely upon Dr. Sladky's opinion extensively"; and, (3) "[U]nder the circumstances in which the Secretary presented the opinion of a different doctor, the problems in Dr. Sladky's licensing and the non-disclosure of these problems ha[ve] minimal effect on this case."  Opin. at 7, 71 n.51.  These statements, in the court's view, lack precision and frustrate review.  Furthermore, not only are these statements vague, but the text of the decision contradicts the assertion that Dr. Sladky's opinions have not been relied upon extensively.

The special master's decision includes extensive citations to Dr. Sladky's specific opinions on a number of issues relevant to the special master's decision on entitlement.  Reference is made to Dr. Sladky's opinions on almost *every* decisive issue in this case – these references are found on pages 11 n.6, 17, 27-29, 36-37, 46 & n.35, 48-52, 54, 59-60, 65-68, 70-71, and 74 of the special master's decision.  Dr. Sladky's substance abuse, licensure problems and lack of candor may indeed have had "minimal effect" on the special master's ruling on entitlement, but the effect of the disclosure of these issues remains ambiguous. The special master's decision reviewed here does not clearly state the special master's determinations regarding the credibility of Dr. Sladky and the reliability of Dr. Sladky's opinions.  The court therefore remands this case to the special master.

## III.   Instructions for Remand

Three clarifications are needed before the court can determine whether the special master has abused his discretion in relying on the expert opinions of Dr. Sladky.  First, the special master must address Dr. Sladky's credibility and reliability in light of the consistent pattern of misrepresentations by Dr. Sladky in his work as an expert for respondent, and provide an unambiguous estimation of

Dr. Sladky's credibility and reliability as an expert.[12]  Second, the special master must compare Dr. Sladky's credibility to the credibility of the experts for petitioner and the witnesses testifying for petitioner.  These clarified credibility determinations should then be integrated into the special master's decision in a manner that presents a clear ruling on entitlement for this court's review.[13]

Third, for the sake of judicial economy, the special master must present an alternative ruling on causation which completely disregards all of Dr. Sladky's opinions and testimony.  This alternative ruling should be adequately detailed to provide this court with holdings that may either be sustained or vacated should this court (or a higher court) determine that Dr. Sladky's testimony should not have been considered at all in this case once the disclosures regarding Dr. Sladky had been provided by the Secretary to the special master.  In the unique circumstances of this case, it would be inefficient to further delay proceedings with another remand to the special master should this court find manifest error in the special master's level of reliance on the opinions of Dr. Sladky.[14]

## CONCLUSION

For all of the above-stated reasons, the court remands this case to the special master so that his credibility and reliability determinations, as well as his holdings regarding causation, are clearly presented for review.  Specifically, for this court

---

[12]/  A distinction should be drawn between the *content* of Dr. Sladky's opinions, which may match the special master's view of the case, and the *credibility* of Dr. Sladky as an expert who provided two expert reports and testimony in this case.  In essence, the question of *credibility* focuses on whether Dr. Sladky was a reliable source of expert opinion in this case, not whether his opinions, as buttressed by other expert opinion and evidence, were persuasive on particular issues.  *See* Opin. at 7 ("The failure to disclose this important information bears on [Dr. Sladky's] credibility and reliability as an expert witness.") (citations omitted).

[13]/  The special master may choose to revise his substantive rulings in this case based on his clarified credibility rulings, or may re-issue the substantive rulings of the opinion with only minor modifications which clarify the sections discussing the credibility of witnesses and the reliability of expert opinion in this case.

[14]/  The court issues no holding here as to the appropriateness of any particular level of reliance on Dr. Sladky's opinions.  It is the *potential* for a ruling requiring the exclusion of Dr. Sladky's opinions and testimony that militates for an alternative finding on causation.

to determine whether or not the special master's evidentiary rulings regarding Dr. Sladky's opinions were manifestly erroneous, the special master must follow the instructions for remand provided in this opinion.  *See, e.g.*, *Piscopo*, 66 Fed. Cl. at 53 ("Determinations as to the qualification of experts and the admissibility of their testimony, including an evaluation of whether the opinion is reliable and relevant, are generally within the discretion of a trial judge, and are reviewed for an abuse of discretion, [and] only overturned if manifestly erroneous.") (citations omitted). The court cannot undertake a review of the special master's ultimate ruling on entitlement without the clarifications specified in this opinion.

Accordingly, it is hereby **ORDERED** that

(1)     Petitioner's Motion for Review, filed December 19, 2013, is **GRANTED**;

(2)     The decision of the special master, filed November 19, 2013, is **SET ASIDE** and **VACATED**;

(3)     This case is **REMANDED** to the special master, pursuant to Vaccine Rule 27(c), for proceedings in accordance with the principles of law and the instructions set forth in this opinion; and

(4)     The parties shall separately **FILE** any proposed redactions to this opinion, with the text to be redacted clearly marked out or otherwise indicated in brackets, on or before **June 6, 2014**.

/s/Lynn J. Bush
LYNN J. BUSH
Senior Judge