# In the United States Court of Federal Claims

No. 05-626 V

(Filed May 6, 2015)[1]

```
* * * * * * * * * * * * *   *
JESSIE CONTRERAS,          *
                           *      National Childhood Vaccine
            Petitioner,    *      Injury Act of 1986, 42 U.S.C.
                           *      §§ 300aa-1 to -34 (2012);
      v.                   *      Review of Credibility
                           *      Determination; Deferential
SECRETARY OF HEALTH AND    *      Review of the Fact Findings of
HUMAN SERVICES,            *      the Special Master.
                           *
            Respondent.    *
                           *
* * * * * * * * * * * * *   *
```

*Jeffrey S. Pop*, Beverly Hills, CA, for petitioner.  *Kristina E. Grigorian*, Beverly Hills, CA, of counsel.

*Linda S. Renzi*, United States Department of Justice, with whom were *Joyce R. Branda*, Acting Assistant Attorney General, *Rupa Bhattacharyya*, Director, *Vincent J. Matanoski*, Deputy Director, *Voris E. Johnson, Jr.*, Assistant Director, Washington, DC, for respondent.

———————————————————

## OPINION AND ORDER

———————————————————

**BUSH**, *Senior Judge*.

———————————————

[1]/ Pursuant to Rule 18(b) of Appendix B of the Rules of the United States Court of Federal Claims, this Opinion and Order was initially filed under seal on April 17, 2015.  Pursuant to ¶ 4 of the ordering language, the parties were to propose redactions of the information contained therein on or before May 1, 2015.  No proposed redactions were submitted to the court.

Now pending before the court is petitioner's motion for review of the special master's decision upon a second remand from this court, *see Contreras v. Sec'y of Health & Human Servs.*, No. 05-626V, 2014 WL 8098606 (Fed. Cl. Spec. Mstr. Oct. 24, 2014) (*Contreras V*),[2] which denied Jessie Contreras's petition for compensation under the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa-1 to -34 (2012) (the Vaccine Act).[3]  Under the standard of review applicable here, the special master's denial of petitioner's entitlement to compensation under the Vaccine Act survives review.  For this reason, the court denies petitioner's motion for review filed November 21, 2014.

## BACKGROUND

### I.   Factual History

Along with *Contreras V*, prior decisions in this case provide a factual background for Jessie's alleged vaccine injury of transverse myelitis (TM) and Guillain-Barré Syndrome (GBS).  *See, e.g.*, *Contreras v. Sec'y of Health & Human Servs.*, 116 Fed. Cl. 472 (2014) (*Contreras IV*); *Contreras v. Sec'y of Health & Human Servs.*, No. 05-626V, 2013 WL 6698382 (Fed. Cl. Spec. Mstr. Nov. 19, 2013) (*Contreras III*), *vacated*, 116 Fed. Cl. 472 (2014); *Contreras v. Sec'y of Health & Human Servs.*, 107 Fed. Cl. 280 (2012) (*Contreras II*); *Contreras v. Sec'y of Health & Human Servs.*, No. 05-626V, 2012 WL 1441315 (Fed. Cl. Spec. Mstr. Apr. 5, 2012) (*Contreras I*), *vacated*, 107 Fed. Cl. 280.  The alleged injury occurred in 2003 when Jessie was thirteen, approximately twenty-four hours after Jessie received inoculations containing the hepatitis B vaccine and the tetanus-diptheria vaccine.  Jessie is now almost twenty-five years of age.  The court reserves further discussion of the factual background of this case for the analysis section of this opinion.

### II.   Procedural History

---

[2]/ The court cites not to the Westlaw version of the special master's opinion on remand, but follows the practice of the parties and cites to the opinion version (*Contreras V* or Opin.) available on this court's website.

[3]/ Hereinafter the court will refer to Mr. Contreras as "petitioner" or "Jessie," because he was thirteen years old at the time of his alleged vaccine injury.

In *Contreras I*, the special master denied petitioner entitlement to compensation under the Vaccine Act.  In *Contreras II*, this court vacated that opinion and remanded the case to the special master for a revised causation analysis.  In *Contreras III*, the special master issued a revised causation analysis which again denied petitioner entitlement to compensation.  Before the special master issued his decision, however, on May 1, 2013 the Secretary filed a status report revealing previously undisclosed information regarding one of respondent's experts, Dr. John T. Sladky, M.D.  The general nature of the information concerned alcohol abuse and the suspension of Dr. Sladky's license to practice medicine.  Dr. Sladky carefully avoided revealing this negative information in documents he supplied to the court and in his testimony before the special master.[4]

In *Contreras IV*, in light of the recently-divulged information regarding Dr. Sladky, the court again remanded this case to the special master in order to obtain three clarifications of his fact findings as to Jessie's entitlement to compensation under the Act.  These clarifications required by the court were set forth in the "Instructions for Remand" section of *Contreras IV*:

> (1)  The special master must address Dr. Sladky's credibility and reliability in light of the consistent pattern of misrepresentations by Dr. Sladky in his work as an expert for respondent, and provide an unambiguous estimation of Dr. Sladky's credibility and reliability as an expert.
> (2)  The special master must compare Dr. Sladky's credibility to the credibility of the experts for petitioner and the witnesses testifying for petitioner.  These clarified credibility determinations should then be integrated into the special master's decision in a manner that presents a clear ruling on entitlement for this court's review.
> (3)  The special master must present an alternative ruling on causation which completely disregards all of Dr. Sladky's opinions and testimony.

---

[4]/  A full recitation of Dr. Sladky's misleading misrepresentations and lack of candor, in this Vaccine Act case and in others, is provided in *Contreras IV* and *Contreras V*.

3

*Contreras IV*, 116 Fed. Cl. at 484 (formatting slightly altered and footnotes omitted).  The special master's opinion in *Contreras V* is structured to respond to these three questions on remand.  *See* Opin. at 2, 13.

## DISCUSSION

### I.    Standard of Review

This court has jurisdiction to review the decision of a special master in a Vaccine Act case.  42 U.S.C. § 300aa-12(e)(2).  "Under the Vaccine Act, the Court of Federal Claims reviews the decision of the special master to determine if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]'"  *de Bazan v. Sec'y of Health & Human Servs.*, 539 F.3d 1347, 1350 (Fed. Cir. 2008) (quoting 42 U.S.C. § 300aa-12(e)(2)(B) and citing *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1277 (Fed. Cir. 2005)) (alteration in original).  This court uses three distinct standards of review in Vaccine Act cases, depending upon which aspect of a special master's judgment is under scrutiny:

> These standards vary in application as well as degree of deference.  Each standard applies to a different aspect of the judgment.  Fact findings are reviewed . . . under the arbitrary and capricious standard; legal questions under the "not in accordance with law" standard; and discretionary rulings under the abuse of discretion standard.

*Munn v. Sec'y of Dep't of Health & Human Servs.*, 970 F.2d 863, 870 n.10 (Fed. Cir. 1992).

The third standard of review, abuse of discretion, is applicable when the special master excludes evidence or otherwise limits the record upon which he relies.  *See id.*  As this court has stated, the third standard applies to the special master's evidentiary rulings, including those regarding the qualifications of an expert:

> Notably, such [discretionary] rulings include determinations regarding the qualification of expert

4

witnesses and the reliability of expert testimony.
*Piscopo v. Sec'y of Health & Human Servs.*, 66 Fed. Cl.
49, 53 (2005); *see* [*Gen. Elec. Co. v. Joiner*, 522 U.S.
136, 142-43 (1997)] (holding that "abuse of discretion is
the proper standard of review of a [trial] court's
evidentiary rulings," including determinations regarding
the reliability of expert testimony under [*Daubert v.
Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)]];
[*Terran ex rel. Terran v. Sec'y of Health & Human
Servs.*, 195 F.3d 1302, 1316 (Fed. Cir. 1999)] (reviewing
for abuse of discretion the Special Master's decision to
reject as unreliable the testimony of the petitioner's
expert). Determinations subject to review for abuse of
discretion must be sustained unless "manifestly
erroneous." *Piscopo*, 66 Fed. Cl. at 53; *see Milmark
Servs., Inc. v. United States*, 731 F.2d 855, 860 (Fed. Cir.
1984) (holding that decisions that lie within the trial
court's discretion are to be sustained unless "manifestly
erroneous").

*Jarvis v. Sec'y of Dep't of Health & Human Servs.*, 99 Fed. Cl. 47, 59 (2011).
Thus, a special master's determination as to the reliability of expert witness
testimony is reviewed under the abuse of discretion, or manifestly erroneous,
standard. *Terran*, 195 F.3d at 1316 (citing *Burns v. Sec'y of Dep't of Health &
Human Servs.*, 3 F.3d 415, 416-17 (1993)); *Jarvis*, 99 Fed. Cl. at 59. The United
States Supreme Court has also stated that a fact-finder's decision to admit or
exclude expert testimony is reviewed for abuse of discretion, and that this review
is deferential. *Joiner*, 522 U.S. at 143 (citing *Koon v. United States*, 518 U.S. 81,
98-99 (1996)).

On the particular topic of a fact-finder's determination as to the credibility
of a testifying witness, the United States Court of Appeals for the Federal Circuit
has often stated that such determinations are "'virtually unreviewable.'" *E.g.*,
*Bradley v. Sec'y of Dep't of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed.
Cir. 1993) (quoting *Hambsch v. Dep't of Treasury*, 796 F.2d 430, 436 (Fed. Cir.
1986)). The court has found no authority, however, which states that a credibility
determination is immune from review, particularly where, as here, extrinsic

evidence has subsequently been disclosed which shows a lack of candor on the part of an expert witness. For this reason, the court reviews the special master's determinations regarding Dr. Sladky's credibility and the reliability of Dr. Sladky's expert opinions for manifest error.

## II.   Analysis

As a threshold matter, the court examines the scope of the remand ordered by *Contreras IV*, which appears to have created, or at least to have contributed to, some confusion. *See* Pet'r's Mot. at 1 n.1 (stating that the "procedural state of the case is unclear"); Resp't's Resp. at 7 n.4 (arguing that some of petitioner's arguments are "beyond the scope of the Court's remand"). *Contreras IV* clearly indicated, however, that both the special master's denial of entitlement and his assessment of the credibility and reliability of medical opinions are within the scope of the latest remand. *See Contreras IV*, 116 Fed. Cl. at 484 (requiring clarified credibility/reliability determinations and an integration of these determinations into the special master's entitlement decision, as well as an alternative finding on entitlement which excludes Dr. Sladky's evidence). Because *Contreras V* does not restate the special master's entitlement decision set forth in *Contreras III*, but merely references that decision as the embodiment of the special master's entitlement decision, the parties were not prevented from contesting the lengthy entitlement analysis which was provided by *Contreras III*. *See Contreras V*, at 37 ("For the reasons explained in [this opinion], Dr. Sladky is sufficiently credible and sufficiently reliable that his evidence should remain in the record. Thus, the outcome of [*Contreras III*], a denial of compensation, does not differ."). Therefore, even though *Contreras III* was vacated by this court, the analysis contained in that decision was incorporated into *Contreras V* by the special master, and that entitlement decision remains within the scope of the court's remand.

In light of the foregoing, the scope of the remand ordered by *Contreras IV* included, at least, the following three elements: (1) clarified credibility/reliability determinations for the medical opinions offered by the parties' experts and witnesses in this case; (2) the entitlement decision set forth in *Contreras III* (supplemented by the clarifications of the special master's credibility/reliability determinations set forth in *Contreras V*); and, (3) the alternative entitlement decision rendered in *Contreras V* which excluded Dr. Sladky's evidence. These

three aspects of *Contreras III* and *Contreras V* were set forth as the proper subject for petitioner's motion for review and the Secretary's response brief.  These three topics also provide the general outline for the court's opinion here.

**A.    The Special Master's Reliance on Dr. Sladky's Medical Opinions Was an Abuse of Discretion**

**1.    Credibility/Reliability in the Context of Later-Disclosed Misrepresentations and Lack of Candor**

The court acknowledges, as does the special master in *Contreras V*, that there is no binding precedent from the Federal Circuit as to the proper course of action to be followed when an expert's lack of candor and misrepresentations regarding his credentials are discovered after a bench trial or hearing.  Opin. at 20. Nor is the court aware of any precedent from the Supreme Court that directly addresses this specific question.  The special master examined a number of cases for guidance and appears particularly influenced by *Elcock v. Kmart Corp.*, 233 F.3d 734 (3d Cir. 2000).  Opin. at 17-18.  The court does not find *Elcock* particularly helpful because much of the instruction in that opinion is focused on the trial court's limited role in assisting a jury to find facts.  *See* 233 F.3d at 751 n.8 (warning that an aggressive approach to assessing the credibility of an expert might "improperly impinge on the province of the ultimate fact-finder, to whom issues concerning the general credibility of witnesses are ordinarily reserved"). Where there is no jury, as here, the credibility/reliability question must be approached differently.

The Secretary cited to *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 458-59 (4th Cir. 1993) when she revealed Dr. Sladky's transgressions, Opin. at 10, and the court finds this case to be more helpful.  Although the special master noted differences between the circumstances in *Shaffer* and the circumstances in this case (in that case the government's attorneys unethically delayed the revelation of their deceitful witness problem), *Shaffer* offers almost exactly the same underlying factual scenario as this case – an important witness is discovered to have repeatedly misrepresented his credentials to his employer and various judicial officers.  A brief examination of *Shaffer* is instructive.

The basic fact scenario in *Shaffer* involved a key government employee who

7

directed environmental clean-up efforts at a polluted site, oversaw the creation of the administrative record of the clean-up efforts, and testified in support of the government's claims seeking to recoup clean-up costs from the landowners. 11 F.3d at 453-55. This employee lied about his educational credentials on his government employment application, his resume, and in depositions or testimony in various lawsuits. *Id.* at 454-55. The trial court, finding that the government's attorneys had violated their duty of candor to the court by not disclosing the credibility problem for this witness, dismissed the government's claims in their entirety. *Id.* at 456.

On appeal, the United States Court of Appeals for the Fourth Circuit first discussed the fundamental requirement for truth in court proceedings:

> Our adversary system for the resolution of disputes rests on the unshakable foundation that truth is the object of the system's process which is designed for the purpose of dispensing justice. However, because no one has an exclusive insight into truth, the process depends on the adversarial presentation of evidence, precedent and custom, and argument to reasoned conclusions – all directed with unwavering effort to what, in good faith, is believed to be true on matters material to the disposition. Even the slightest accommodation of deceit or a lack of candor in any material respect quickly erodes the validity of the process. As soon as the process falters in that respect, the people are then justified in abandoning support for the system in favor of one where honesty is preeminent.

*Shaffer*, 11 F.3d at 457. In the case before the Fourth Circuit, the government's key employee was "responsible for making" the administrative record of the clean-up, and his "credentials, capability and credibility [we]re relevant to the examination of the administrative record in this case." *Id.* at 460. The appeals court concluded that "[t]he fact that the government's agent in charge of monitoring expenses and selecting responses [to the presence of hazardous waste] filed fraudulent documents with the federal government and perjured himself repeatedly in connection with his federal employment is, we think, of primary

relevance to an examination of the integrity and reliability of the administrative record." *Id.* Thus, this employee's credibility was material to the outcome of the dispute before the trial court. *Id.* at 461.

The appeals court did not agree with the trial court, however, that the extreme sanction of dismissal was the appropriate resolution with regard to the credibility and lack of candor problems in the government's presentation of its case. Instead, the circuit court's approach was to caution that a trial court was required to not only exercise its inherent power to dismiss with restraint, but that it could only exercise that power after considering several factors. These factors, which in the court's view evince an obvious general applicability to situations in which candor to a court has been lacking, were set forth by the circuit court as follows:

> (1) the degree of the wrongdoer's culpability; (2) the extent of the client's blameworthiness if the wrongful conduct is committed by its attorney, recognizing that we seldom dismiss claims against blameless clients; (3) the prejudice to the judicial process and the administration of justice; (4) the prejudice to the victim; (5) the availability of other sanctions to rectify the wrong by punishing culpable persons, compensating harmed persons, and deterring similar conduct in the future; and (6) the public interest.

*Shaffer*, 11 F.3d at 462-63. The court notes, in particular, the Fourth Circuit's interest in the deterrence of similar conduct in the future, as well as its interest in safeguarding public access to judicial proceedings untainted by deception.

The special master here does not appear to have considered either deterrence or the public interest in his credibility and reliability findings regarding Dr. Sladky, or in his decision to rely upon Dr. Sladky's evidence in this case. Dr. Sladky's evidence on every topic, save his credentials, has been accorded full and undiminished weight in *Contreras III* and *Contreras V*.[5] According to the special

---

[5]/ The special master was obliged by the remand to also provide an alternative finding on
(continued...)

9

master's opinion:

> Dr. Sladky satisfies the minimal standard for credibility.  Dr. Sladky also offered opinions based upon reliable methodologies.  His opinions, therefore, remain in the record and, to the extent that Mr. Contreras has argued that his testimony should be stricken, Mr. Contreras's request is denied.

Opin. at 31.  In the court's view, the special master's reliance on Dr. Sladky's testimony and opinions constitutes manifest error and an abuse of discretion.

In his latest opinion, the special master ably surveys cases which show the range of measures that a judicial officer may take in response to the disclosure of negative information reducing a witness's credibility.  Opin. at 16-26.  It is difficult to establish a bright-line rule for Vaccine Act proceedings from these cases, for a number of reasons.  Some of the cases discussed by the special master address the admissibility of witness testimony, and give basic guidance as to when a trial judge should permit a witness with credibility problems to testify in front of a jury.  *See, e.g.*, *In re Heparin Prods. Liab. Litig.*, 803 F. Supp. 2d 712, 752 (N.D. Ohio 2011) (admitting some testimony and excluding other testimony by a medical expert and indicating that the trial judge would "provide a cautionary instruction informing the jury that Dr. Burch lied under oath in this proceeding and others about some aspects of his credentials, and his opinions are therefore subject to greater scrutiny").  Because a special master is the ultimate fact-finder and does not instruct a jury, these evidentiary rulings in the context of jury trials are not as relevant to the issue presented in this case.

Even when a bench trial ruling regarding a witness's below-average credibility is presented in the cases cited by the special master, it is impossible to discern a rule for solving the problem of an expert witness who consistently misrepresents his credentials.  In an unreported decision cited by the special master, a United States District Court was adjudicating a damages dispute after liability had already been decided when one of the damages experts

---

[5](...continued)
entitlement which excluded Dr. Sladky's evidence.  For this alternative finding, the special master's assessment of Dr. Sladky's credibility and reliability was irrelevant.

misrepresented his recently-expired credential. *Pikas v. Williams Cos.*, No. 8-cv-101-GKF-PJC, 2013 WL 622234, at *1 (N.D. Okla. Feb. 20, 2013). The district court refused to strike the expert's declarations, without much explanation, other than to state that his opinions were "helpful to understanding the issues before the court." *Id.* at *2. As the special master noted here, not only did Dr. Sladky repeatedly misrepresent that he was currently licensed in Pennsylvania (although that license had expired almost ten years before the filing in this case of his inaccurate *curriculum vitae*), he also repeatedly misled a number of special masters as to his licensure in Georgia and his medical practice. Opin. at 24-26. The court does not view *Pikas* as persuasive authority – it presents neither a thorough analysis nor an analogous fact-pattern.

The court finds more persuasive authority in *In re Unisys Sav. Plan Litig.*, 173 F.3d 145 (3d Cir. 1999), a precedential decision also cited by the special master. The United States Court of Appeals for the Third Circuit affirmed the trial court's decision to exclude expert testimony because "[w]e would be hard pressed to require a District Court judge sitting in a non-jury case who credibly and with reason found that he could not believe a witness to nevertheless hear the witness's direct examination, cross-examination, and rebuttal examination in an extended trial when he knew that he would only reject it as unbelievable." *Id.* at 157. The trial judge could not believe the expert because his credibility and reliability had been diminished for a number of reasons, including the provision of conflicting testimony regarding his credentials. *Id.* at 156-57. It is important to note that the Third Circuit in *Unisys* appears to have found rough equivalence among the terms "credibility," "reliability," "believability" and "weight to be accorded expert testimony," because such terms are used interchangeably in its analysis. *Id.* at 156-58. The court finds this analytical construct persuasive, and concludes that an expert witness who is not credible does not, as a general rule, provide reliable expert testimony.

Even if a pattern of misrepresentation is seen by the fact-finder as less consequential in its effect on an expert witness's credibility and reliability, the court cannot read persuasive caselaw as permitting a fact-finder to brush past the credibility problem merely because the only documented misrepresentations in the record were on the subject of the expert's qualifications. In similar cases, a rational approach is to diminish the weight of that expert's testimony or to subject that expert's testimony to stricter scrutiny. *See, e.g., Harkabi v. SanDisk Corp.*,

891 F. Supp. 2d 527, 539 (S.D.N.Y. 2012) (noting that an expert, Dr. Johnson, had twice exaggerated her credentials in that litigation and stating that "this Court discounts Dr. Johnson's opinions and views them skeptically"); *Roberts v. Sec'y of Health & Human Servs.*, No. 09-427V, 2013 WL 5314698, at \*9 (Fed. Cl. Spec. Mstr. Aug. 29, 2013) (finding the opinions of Dr. Sladky to be less reliable and of less weight than those of the petitioners' experts due, in part, to his lack of candor regarding his licensure problems).   The court sees no sign that the special master in this case discounted the substantive testimony and opinions provided by Dr. Sladky, despite being confronted with far more information regarding Dr. Sladky's pattern of misrepresentations as to his credentials than had been presented to the special master in *Roberts*.

In another Vaccine Act case, the chief special master thoroughly explored the issue of Dr. Sladky's credibility and reliability, as well as the pattern of misrepresentations in his work for respondent in a number of cases, when she discussed two expert "witnesses with ethical challenges."   *Raymo v. Sec'y of Health & Human Servs.*, No. 11-654V, 2014 WL 1092274, at \*14 (Fed. Cl. Spec. Mstr. Feb. 24, 2014).   The chief special master carefully examined the importance of truthfulness as a factor in credibility and reliability:

> Standing alone, the basis for Dr. Sladky's disciplinary action might not affect the reliability of his expert opinions.   However, his failure to disclose the disciplinary action to respondent, his authoring of expert opinions while he did not have an active medical license, and the failure to reflect his voluntary leave from medical practice due to a substance abuse problem on the [*curriculum vitae*] filed in this case all cast doubt about his credibility as a witness.

*Id.* at \*15.   The court notes that the chief special master, like the Third Circuit in *Unisys*, treated credibility and reliability as related and roughly equivalent concepts.   *See id.* at \*13-15 (employing the terms credibility and reliability interchangeably).

The chief special master in *Raymo* concluded that she must exclude Dr. Sladky's opinions:

12

> Although both Dr. Becker and Dr. Sladky are well
> qualified to opine, I cannot rely on their opinions.  I
> administer an oath to witnesses that requires that they tell
> the whole truth.  Neither Dr. Becker nor Dr. Sladky told
> the whole truth.  Both demonstrated a lack of candor
> that, although not related directly to the substance of
> their causation opinions, reflect their willingness to, at
> the very least, shade the truth.  In the case of Dr. Becker,
> he attempted to pass off another's work as his own.  In
> the case of Dr. Sladky, it appears that he so feared the
> loss of his position and income as a case reviewer for
> respondent that he withheld facts concerning his medical
> license suspension.  I thus do not rely at all on their
> expert opinions in this case.

2014 WL 1092274, at *16.  The court notes that the chief special master in *Raymo* based her decision to exclude Dr. Sladky's opinions on her knowledge of a limited number of misrepresentations by Dr. Sladky, whereas the special master in this case has now reviewed a more complete record yet he continues to rely on Dr. Sladky's opinions.

Having reviewed the most persuasive cases discussing, in a non-jury setting, the significance of:  (1) truthfulness in judicial proceedings; (2) lack of candor to the court; (3) misrepresentations of an expert witness's credentials; (4) the importance of deterrence of similar behavior; and, (5) the close connection between credibility and reliability, the court believes that in the circumstances of this case it was manifest error for the special master to fail to exclude Dr. Sladky's evidence, or at the very least, to significantly discount the reliability and weight of Dr. Sladky's opinions.  Although a variety of meaningful responses to Dr. Sladky's "ethical challenges" might have been appropriate, it was an abuse of discretion to completely ignore those ethical challenges in weighing the reliability of Dr. Sladky's opinions.  *See* Opin. at 27 n.17 ("The reliability of Dr. Sladky's opinion does not take into account the lack of disclosures that diminish his credibility.").  In other words, the special master's conclusions that "Dr. Sladky satisfies the minimal standard for credibility," *id.* at 31, and that Dr. Sladky's opinions on diagnosis, timing, and causation were reliable, *id.* at 29-31, constitute manifest error.

### 2.   Credibility and Reliability Cannot Be Viewed as Distinct and Severable Concepts

The special master analyzed Dr. Sladky's credibility and reliability separately, and treated these two terms as distinct aspects of an expert's evidence. It appears that the special master believes that an expert witness can be judged to be not credible, but can at the same time be judged to be a source of reliable expert testimony.  The court provides here a few excerpts from *Contreras V* to illustrate the special master's logical construct.

First, after a lengthy discussion of Dr. Sladky's lack of candor with the Secretary and this court, the special master notes:

> It is relatively easy to find that Dr. Sladky feared answering questions about why he lost his license and his fear motivated him to do what he could to avoid answering those questions.  What Dr. Sladky did to protect himself was to remain silent.  This was an error on Dr. Sladky's part and this error appears to be intentional.

Opin. at 25 (discussing one "factor weighing against Dr. Sladky's credibility"). Nonetheless, the special master balanced Dr. Sladky's credibility "negatives" with what he apparently viewed as credibility "positives":

> Given that Dr. Sladky testified in Mr. Contreras's case, it is appropriate to review the remainder of his testimony to look for places when he could be viewed . . . as shading the truth. . . .  The remainder of Dr. Sladky's testimony should be considered in evaluating his credibility because special masters should consider the entire record in making a decision.
> Does Dr. Sladky's substantive testimony demonstrate other examples of presenting something other than the truth, the whole truth, and nothing but the truth?  Apart from the aspect of his testimony concerning his personal qualifications, Dr. Sladky appeared

14

accurate, honest, and forthcoming.

*Id.* at 26 (citations omitted).  The court notes that this is an odd test for credibility, which apparently calculates whether the number of instances of known deceptions are outweighed by instances of what appear to be truthful and accurate statements. The special master cites as authority for this approach the dissent rejected in *Unisys*.  *Id.*

After recounting elements in Dr. Sladky's testimony which could be viewed as favoring petitioner's cause, the special master stated that "[f]or his substantive opinions, Dr. Sladky appeared credible," and that "[o]n the whole, Dr. Sladky's candor on substantive matters offsets his lack of disclosures regarding personal matters."  Opin. at 27.  The special master then concluded that "Dr. Sladky is sufficiently credible that his testimony should be evaluated for its reliability."  *Id.*

In the court's view, the first half of the credibility/reliability analysis in *Contreras V*, which apparently gives Dr. Sladky a passing credibility score because his misrepresentations as to his qualifications were outnumbered by "forthcoming" statements interpreting medical science, is neither logical nor grounded in persuasive authority.  In *Shaffer*, for example, the government's attorneys, despite their ethical lapses, ceased to rely on their key witness once they knew he had repeatedly lied about his credentials. 11 F.3d at 455.  They clearly had no expectation that the fact-finder would credit his testimony after his untruths had been revealed.  The court sees no logical reason why a pattern of misrepresentation and lack of candor should be seen as a minor factor in the determination of the credibility of a witness which can be overshadowed by testimony which contains no apparent falsehoods.

In persuasive caselaw, courts typically consider an expert's misrepresentations as to his qualifications to be serious transgressions.  *See, e.g.*, *In re Vioxx Prods.*, 489 F. Supp. 2d 587, 591-94 (E.D. La. 2007) (granting a new trial because a testifying cardiologist with an expired board certification had asserted that he was "board certified," and commenting that the expert's "misrepresentation call[s] into question the Court's acceptance of him as an expert witness, [and] also sheds an unfavorable light upon his propensity for truthfulness").  In a non-jury setting, where the judge or other judicial officer is the ultimate finder of fact, such misrepresentations are a dominant factor in credibility

determinations, not a minor one. *See, e.g.*, *Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378, 1383-86 (11th Cir. 1988) (finding that where the testifying expert for the prevailing party had perjured himself as to his qualifications, a lower court had abused its discretion when it refused to vacate the portion of an arbitration award which relied upon that expert's testimony); *In re WRT Energy Corp.*, 282 B.R. 343, 371 (Bkrtcy. W.D. La. 2001) ("The court cannot trust the word of an expert witness who would brazenly lie about her credentials and then further lie when caught. If she would lie about her academic credentials, there is no reason to believe that she would not provide erroneous and/or misleading valuation testimony if she believed it would benefit her client. The court, therefore, will not ascribe any weight to the evidence supplied by [this expert]."). In cases which do not involve juries, the court has found no authority for the proposition that a judicial officer should establish his or her credibility determination by balancing known lies or deceptions against representations which appear to be forthright. Thus, the court finds the first half of the special master's credibility/reliability analysis to constitute manifest error and an abuse of discretion, because it runs counter to reason and persuasive authority.

The court turns now to the special master's assessment of the reliability of the evidence provided by Dr. Sladky. As stated *supra*, the special master excluded Dr. Sladky's lack of candor and misrepresentations from the inquiry into the reliability of Dr. Sladky's evidence. Opin. at 27 n.17. Instead of clarifying the impact of Dr. Sladky's credibility problems upon the reliability of his evidence, as this court attempted to request in its remand, the special master performed a *Daubert* analysis of Dr. Sladky's opinions provided in this case. *Id.* at 27. The special master acknowledged that there is some imprecision in the use of the terms credibility and reliability in Vaccine Act cases and elsewhere. *Id.* at 20 n.13 (citations omitted).

To the extent that the remand instructions in *Contreras IV* may have contributed to the special master's decision to divorce credibility from reliability, the court regrets any ambiguity in that opinion. The court utilized both terms, credibility and reliability, in its remand instructions because each of these terms is present in precedential cases discussing the credibility of expert witnesses in the Vaccine Program. *See, e.g.*, *Porter v. Sec'y of Health & Human Servs.*, 663 F.3d 1242, 1250 (Fed. Cir. 2011) (holding that "this court has unambiguously explained that special masters are expected to consider the credibility of expert witnesses in

16

evaluating petitions for compensation under the Vaccine Act"); *Broekelschen v. Sec'y of Health & Human Servs.*, 618 F.3d 1339, 1347 (Fed. Cir. 2010) (noting that a special master weighs both "the credibility of the experts and the relative persuasiveness of their competing theories") (citation omitted); *Moberly ex rel. Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1325-26 (Fed. Cir. 2010) ("Assessments as to the reliability of expert testimony often turn on credibility determinations . . . .") (citations omitted); *Andreu ex rel. Andreu v. Sec'y of Dep't of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009) (distinguishing credibility, as a measurement of candor, from the assessment of the weight of scientific evidence).  In light of the varying precedential formulations of the credibility inquiry, the court included both credibility and reliability in its instructions for remand so that no aspect of Dr. Sladky's diminished credibility would be overlooked by the special master.  *See Contreras IV*, 116 Fed. Cl. at 484 (stating that "the special master must address Dr. Sladky's credibility and reliability in light of the consistent pattern of misrepresentations by Dr. Sladky in his work as an expert for respondent, and provide an unambiguous estimation of Dr. Sladky's credibility and reliability as an expert").  The court also attempted to explain the purpose of its request for a clarified credibility determination:

> A distinction should be drawn between the *content* of Dr. Sladky's opinions, which may match the special master's view of the case, and the *credibility* of Dr. Sladky as an expert who provided two expert reports and testimony in this case.  In essence, the question of *credibility* focuses on whether Dr. Sladky was a reliable source of expert opinion in this case, not whether his opinions, as buttressed by other expert opinion and evidence, were persuasive on particular issues.

*Id.* at 484 n.12.

In *Contreras V*, the special master concluded that Dr. Sladky's diminished credibility was not relevant to the determination of the reliability of Dr. Sladky's testimony and opinions.  In *Contreras III*, he came to the opposite conclusion: "The failure to disclose this important information [regarding Dr. Sladky's alcoholism and licensure problems] bears on [Dr. Sladky's] credibility and reliability as an expert witness."  2013 WL 6698382, at *5 (citations omitted).

Perhaps this is merely a question of imprecision as to the meaning of the term "reliability."  In the court's view, once Dr. Sladky's misrepresentations and lack of candor came to light, the question necessarily became one of credibility and reliability as these terms refer to trustworthiness, not as to the scientific legitimacy of his opinions that might be tested through *Daubert* or other means.

The court cannot wholly separate credibility from reliability in this case.  As noted *supra*, courts generally find a strong connection between an expert's credibility and the reliability of that expert's opinions; further, these determinations are not unrelated to the question of how much weight should be accorded to a particular expert's opinion, or whether such an opinion is ultimately found to be persuasive.  *E.g.*, *Porter*, 663 F.3d at 1250-51; *Broekelschen*, 618 F.3d at 1347; *Moberly*, 592 F.3d at 1325-26; *Unisys*, 173 F.3d at 156-58; *Harkabi*, 891 F. Supp. 2d at 539; *Raymo*, 2014 WL 1092274, at *16; *Roberts*, 2013 WL 5314698, at *9.  The court finds nothing in the special master's assessment of Dr. Sladky's "reliability," under *Daubert*, to redeem the special master's determination that Dr. Sladky "satisfies the minimal standard for credibility."  Opin. at 31.

### 3.    The Special Master's Credibility and Reliability Determinations Cannot Stand

The abuse of discretion standard applicable here is highly deferential, as noted *supra*.  In the particular circumstances of this case, however, the court finds that the special master failed to integrate a rational credibility determination into his ruling on entitlement in *Contreras III*.  It would have been rational to have excluded Dr. Sladky's evidence, as did the chief special master in *Raymo*.  It could have been rational to have considered Dr. Sladky's evidence while assigning that evidence diminished weight and greater scrutiny.  The special master in this case chose neither of these rational courses of action.  Based on this court's review of relevant authority, and particularly in light of the need for deterrence of similar behavior from experts guiding special masters in Vaccine Act cases, the court finds that the special master's credibility and reliability determinations in *Contreras V* constitute manifest error and an abuse of discretion.

### B.    The Special Master's Denial of Entitlement to Compensation in *Contreras III*, Tainted by Unqualified Reliance on Dr. Sladky's Testimony and Opinions, Cannot Be Sustained

1.   **Dr. Sladky's Testimony and Opinions Were Sufficiently Important to the Result in *Contreras III* to Invalidate That Ruling**

If Dr. Sladky had been merely a peripheral witness in this litigation, the special master's unqualified (and inappropriate) reliance on Dr. Sladky's testimony and opinions for his entitlement ruling in *Contreras III* might have been harmless error.  But as the special master clearly shows in *Contreras V*, Dr. Sladky's testimony and opinions were considered for rulings on Jessie's diagnosis, Opin. at 39, 41; the timing of onset, *id.* at 44-47; the theory of causation, *id.* at 53-56; and, albeit minimally, any logical sequence of cause and effect connecting Jessie's vaccinations to his alleged vaccine injury, *id.* at 57.  Because *Contreras III* and the special master's findings on entitlement therein, as clarified by *Contreras V*, rely on Dr. Sladky's testimony and opinions as if he had no credibility problems at all, the court finds that the entitlement ruling in *Contreras III* is tainted by the special master's manifest error and cannot be sustained.

2.   **Less Significant Errors in *Contreras III* and *Contreras V***

a.   **Diagnosis Not Required in Jessie's Case**

The special master's causation analysis in *Contreras I* began with his diagnosis of Jessie's alleged vaccine injury; the special master found preponderant evidence of a sole diagnosis of TM, not TM and GBS.  *Contreras I*,  2012 WL 1441315, at *8.  In *Contreras II*, this court opined that diagnosis by a special master of an alleged vaccine injury is not appropriate except in limited circumstances, none of which applied in this case.  *Contreras II*, 107 Fed. Cl. at 293-95 (citing *Locane v. Sec'y of Health & Human Servs.*, 685 F.3d 1375, 1381 n.3 (Fed. Cir. 2012); *Lombardi v. Sec'y of Health & Human Servs.*, 656 F.3d 1343, 1351 (Fed. Cir. 2011); *Broekelschen*, 618 F.3d at 1346).  In *Contreras III*, the special master again began his causation analysis with a diagnosis of Jessie's alleged vaccine injury, although he asserted that his "finding that Mr. Contreras did not suffer GBS appears to be in accord with this [court's] instruction [in *Contreras II*] because Dr. Lake (not the undersigned) diagnosed Mr. Contreras's illness."  *Contreras III*, 2013 WL 6698382, at *25 n.24.  Although Dr. Lake never testified and never submitted a report in this case, the special master relied on Dr. Lake's notes in Jessie's medical records, among other sources of information, to

diagnose Jessie with TM, not TM and GBS.

The court restates here its concern regarding the special master's threshold inquiry into the diagnosis of Jessie's alleged vaccine injury.  In a typical Vaccine Act case adding this threshold inquiry does not serve a useful purpose and may actually cause significant harm:

> If . . . the petitioner's array of symptoms is diagnosed, perhaps wrongly, by the special master, as an initial step in the causation-in-fact analysis, that petitioner's case could be drastically compromised.  The testimony mustered by the petitioner might focus on a causation mechanism that could persuasively link a vaccine to petitioner's proffered diagnosis, but that same testimony might be unpersuasive as to causation of the diagnosis assigned by the special master.  The special master's fact findings as to the diagnosis of the petitioner's illness, under an overbroad reading of *Broekelschen*, would be virtually unassailable upon review.  The petitioner, in essence, would be forced to prove causation-in-fact of an illness diagnosed by the special master based on his reading of the evidence.

*Contreras II*, 107 Fed. Cl. at 295.  Once *Contreras II* issued, however, the precedential landscape changed somewhat, and a threshold inquiry into diagnosis was approved in another decision by the Federal Circuit.  *See Hibbard v. Sec'y of Health & Human Servs.*, 698 F.3d 1355 (Fed. Cir. 2012).  The court sees no authorization in *Hibbard* for the type of causation analysis conducted here, however.

In *Hibbard*, the Federal Circuit broached the diagnosis topic by first summarizing three cases where a special master correctly conducted a threshold diagnosis inquiry as a supplement to the causation inquiry set forth in *Althen*:

> In previous cases, this court has sanctioned an approach similar to the one taken in this case, in which a special master has addressed the nature of the injury suffered

before addressing the question whether there is a viable medical theory by which a vaccine can cause the injury claimed by the petitioner.  *See Locane*, 685 F.3d 1375; *Lombardi v. Sec'y of Health & Human Servs.*, 656 F.3d 1343 (Fed. Cir. 2011); *Broekelschen v. Sec'y of Health & Human Servs.*, 618 F.3d 1339 (Fed. Cir. 2010).
In each of those cases, there was a dispute as to the nature of the petitioner's injury, and in each case the special master's findings on the nature of the injury that the petitioner incurred were sufficient to resolve the case because the special master found that the injury the petitioner incurred was not one that could have been vaccine-induced according to the petitioner's medical theory.

*Hibbard*, 698 F.3d at 1365.  Thus, *Hibbard* teaches that in some cases where a significant dispute as to diagnosis has been presented by the parties, and where a specific diagnosis is sufficient to resolve the case, a special master may diagnose the alleged vaccine injury.

Here, however, as this court stated in *Contreras II*, there was no significant dispute as to the type of illness Jessie suffered, and a diagnosis of TM versus TM plus GBS was not considered by the parties, or even by the special master, to be crucial to the resolution of this case.  Yet the special master apparently believes that even in these circumstances it was appropriate for the special master to diagnose Jessie's alleged vaccine injury before conducting the causation analysis required by *Althen*.  The court disagrees, and turns to *Hibbard* for further guidance.

In *Hibbard*, the causation analysis was distinguishable from the analysis required in this case.  Although the parties agreed that Ms. Hibbard's chronic nerve condition was dysautonomia, they disagreed as to whether an intermediate injury, autonomic neuropathy, linked the vaccine to her chronic condition.  *Hibbard*, 698 F.3d at 1358.  In such a circumstance, where the damage caused by autonomic neuropathy was posited to have caused the chronic condition of dysautonomia, the special master rightly inquired as to whether Ms. Hibbard had ever experienced autonomic neuropathy.  Her entire medical theory depended on

21

that crucial intermediate step:

> The issue that the special master addressed in this case is whether Ms. Hibbard suffers from autonomic neuropathy.  As [her expert's] report and testimony made clear, that was a necessary component of her theory of vaccine-induced injury.  Therefore, even assuming the medical plausibility of Ms. Hibbard's theory of causation – that the vaccine triggered an immune response that damaged her autonomic nerves – her failure to show that she had autonomic neuropathy would be fatal to her case.

*Hibbard*, 698 F.3d at 1365.  Here, in contrast, the theory advanced by Jessie's experts did not rely on a crucial, intermediate injury in whose absence Jessie's petition would necessarily have been dismissed.

For the reasons stated in *Contreras II*, and in light of the Federal Circuit's decision in *Hibbard*, the court continues to believe that, except in unusual circumstances, a threshold inquiry by the special master into the diagnosis of the alleged vaccine injury is not appropriate.  Most cases can be decided through the *Althen* framework, by establishing through a preponderance of the evidence:

> (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury.

*Althen*, 418 F.3d at 1278.  The *Althen* framework, often referred to as the three *Althen* prongs, allows the typical petitioner to attempt to prove his or her own *prima facie* case, and does not require that the petitioner defend against the diagnostic fact-finding of a special master.  The court does not believe that a threshold inquiry into the specific diagnosis of Jessie's alleged vaccine injury was appropriate in this case.[6]

---

[6]/  By itself, this error is harmless, because the special master has made it clear that his

(continued...)

### b.     *Althen* Prong One Burden Was Inappropriately Heightened

*Althen* prong one examines whether a petitioner has established "a medical theory causally connecting the vaccination and the injury."  418 F.3d at 1278.  The special master did not make any findings of fact regarding *Althen* prong one in *Contreras I*, but was required to do so by *Contreras II*.  In *Contreras III*, the special master found that petitioner's evidence did not establish, by a preponderance of the evidence, the reliability of the causation mechanism posited by petitioner's experts.  *See Contreras III*, 2013 WL 6698382, at *39 ("Mr. Contreras has not provided preponderant evidence that demonstrates the reliability of the proposition that the hepatitis B vaccine can cause transverse myelitis (or GBS) via molecular mimicry with respect to the *Daubert* factors.").  In *Contreras V*, the special master again concluded that petitioner "failed to show the persuasiveness of [his expert's] theory as measured against the *Daubert* factors." Opin. at 56.

In *Contreras V*, the special master expounded upon his ruling on *Althen* prong one, noting, in particular, that the petitioner's expert Dr. Steinman relied upon a causation theory founded on the mechanism of "molecular mimicry," a theory which has some credence in the scientific community.  Opin. at 56 (noting that Dr. Steinman's theory is a "plausible construct"); *see also Contreras III*, 2013 WL 6698382, at *34 ("Molecular mimicry appears in articles published in highly regarded medical journals and Dr. Steinman has written some of these articles."). The special master also mentioned that petitioner might have buttressed the persuasiveness of his expert's theory with evidence of testability and peer review,

---

[6](...continued)
findings as to the timing prong of *Althen* apply whether Jessie experienced TM, or TM and GBS. *See Contreras V*, at 43 (noting that the opinion of respondent's expert regarding the timing issue, which was ultimately the most persuasive evidence considered by the special master, would not change if Jessie had TM and GBS, as opposed to TM only); *Contreras III*, 2013 WL 6698382, at *25 (stating that "the medically-acceptable time-frame for the onset of transverse myelitis after vaccination would remain an issue even if Mr. Contreras were found to suffer from GBS in addition to transverse myelitis"); *see also Contreras I*, 2012 WL 1441315, at *8 ("It is important to emphasize that the same result would be reached if Mr. Contreras suffered from both transverse myelitis and Guillain-Barré syndrome.  The outcome of Mr. Contreras's case depends on the interval between his vaccinations and the onset of his disease, not on the specific disease.").

but that such evidence was lacking in this case.  Opin. at 53.  In the end, the special master ruled that "plausibility does not satisfy Mr. Contreras's burden" on *Althen* prong one.  *Id.* at 56 (citing *Moberly*, 592 F.3d at 1322).

Plausibility, however, in many cases *may* be enough to satisfy *Althen* prong one.  *See, e.g.*, *Hibbard*, 698 F.3d at 1365 (stating that under *Althen* prong one "Ms. Hibbard had to show . . . the medical plausibility of her theory of causation"); *[M.S.B.] ex rel. Bast v. Sec'y of Health & Human Servs.*, 117 Fed. Cl. 104, 119 (2014) (stating that the burden for *Althen* prong one is for the petitioner to "put forth a biologically plausible theory explaining how the vaccines could have caused the sustained injury"); *Hirmiz v. Sec'y of Health & Human Services*, No. 06-371V, 2014 WL 4638375, at *15 (Fed. Cl. Spec. Mstr.) (describing the burden under *Althen* prong one as "petitioners' burden of demonstrating a plausible medical theory"), *aff'd*, 119 Fed. Cl. 209 (2014).  *Althen* prong one merely demands a threshold level of scientific reliability for an expert's proposed biological mechanism which can cause a vaccine injury.

Any reliance on *Moberly* by the special master to reject plausible biological mechanisms, Opin. at 56 (citing *Moberly*, 592 F.3d at 1322), is misplaced.  The discussion of plausibility in *Moberly* does not focus on *Althen* prong one specifically, and has no relevance to the question of whether a plausible medical theory satisfies *Althen* prong one.  Instead, the Federal Circuit in *Moberly* simply required "some indicia of reliability" regarding the medical theory advanced by petitioners for the purposes of satisfying *Althen* prong one.  592 F.3d at 1324.

*Moberly* does indicate that plausibility, in general, is insufficient for a petitioner to establish overall causation-in-fact in Vaccine Act cases.  *See* 592 F.3d at 1322 (distinguishing a lower plausibility standard from the preponderant standard for evidence of causation-in-fact).  But that guidance refers to petitioner's overall burden to prove causation under the Vaccine Act, not petitioner's specific burden under *Althen* prong one.  *See id.* (citing 42 U.S.C. § 300aa-13(a)(1)(A)).  The court has found no evidence that a plausible medical theory is *per se* inadequate to satisfy *Althen* prong one.

A recent decision of the Federal Circuit, which again focused on the overall causation-in-fact burden for petitioners under the Vaccine Act, also discusses plausibility:

> [I]n the past we have made clear that simply identifying a
> "plausible" theory of causation is insufficient for a
> petitioner to meet her burden of proof. *Moberly*, 592
> F.3d at 1322. Instead, the statutory standard of
> preponderance of the evidence requires a petitioner to
> demonstrate that the vaccine more likely than not caused
> the condition alleged. *See id.* ("[P]roof of a 'plausible'
> or 'possible' causal link . . . is not the statutory
> standard."); *see also* 42 U.S.C. § 300aa-13(a)(1).

*LaLonde v. Sec'y of Health & Human Servs.*, 746 F.3d 1334, 1339 (Fed. Cir.
2014). But this same decision also references *Hibbard* and the burden on
petitioners to prove the "medical plausibility" of their proposed biological
mechanism so as to satisfy *Althen* prong one. *Id.* at 1340 (citing *Hibbard*, 698
F.3d at 1365). Thus, while plausibility is not enough to show that a particular
vaccine caused a particular injury, this is a separate question from the inquiry
required by *Althen* prong one. *See, e.g., Veryzer v. Sec'y of Health & Human
Servs.*, 100 Fed. Cl. 344, 352 (2011) (explaining that plausibility goes to *Althen*
prong one, because "plausibility is confined properly to general causation – the
biological or medical theory put forward – [not] *Althen*'s second prong . . .
examining specific or legal causation"), *aff'd*, 475 F. App'x 765 (Fed. Cir. 2012).

The inquiry for *Althen* prong one has often been described as the question of
whether a particular vaccine "can" cause a particular type of injury. *See, e.g.,
Hibbard*, 698 F.3d at 1365 (describing the inquiry for *Althen* prong one as "the
separate (and frequently more difficult) question whether there is a medical theory,
supported by 'reputable medical or scientific explanation,' by which a vaccine can
cause the kind of injury that the petitioner claims to have suffered" (citing *Althen*,
418 F.3d at 1278)). In other words, the petitioner must present a "viable" medical
theory. *Id.* The special master did not apply this precedential standard in his
*Althen* prong one analysis, because he required more than a plausible medical
theory. Perhaps this error was based on a misreading of the discussion of
plausibility in *Moberly* and *LaLonde*.

The court has reviewed the expert reports and hearing transcripts in this
case. Dr. Steinman's molecular mimicry theory appears to be far more reliable and
viable than the theories criticized and rejected in *LaLonde* and *Moberly*. *See, e.g.,*

*Barone v. Sec'y of Health & Human Servs.*, No. 11-707V, 2014 WL 6834557, at *8 (Fed. Cl. Spec. Mstr. Nov. 12, 2014) (listing cases accepting molecular mimicry as a reliable medical theory for vaccine injuries).  Respondent's most persuasive expert in this case testified that molecular mimicry has been the subject of study for a number of years, and that there is some evidence that molecular mimicry is linked to auto-immune diseases, a category of diseases which includes TM and GBS.  Hearing Transcript at 419, 426.  Because the special master's analysis of *Althen* prong one imposed a higher burden on petitioner than is appropriate under Federal Circuit precedent, and because the record evidence regarding Dr. Steinman's proposed biological mechanism appears to present a sufficiently reliable scientific theory, the special master's ruling on *Althen* prong one in this case was in error.[7]

### C.    Although the Special Master Abused His Discretion When Relying on Dr. Sladky's Testimony and Opinions, His Alternate Ruling on *Althen* Prong Three Which Ignores Dr. Sladky's Testimony and Opinions Survives Review

The special master has consistently ruled, in *Contreras I*, *Contreras III*, and *Contreras V*, that twenty-four hours is too short a time-frame for Jessie's vaccinations to have caused TM, or a combination of TM and GBS.  For this reason, the special master denied Jessie entitlement to compensation under the Vaccine Act because the preponderance of the evidence as to *Althen* prong three did not weigh in his favor.  *See Althen*, 418 F.3d at 1278 (requiring that a petitioner establish a "proximate temporal relationship between vaccination and injury").  As this court noted in *Contreras II*, petitioner was required to show that the onset of Jessie's alleged vaccine injury occurred within a "medically-acceptable time-frame."  107 Fed. Cl. at 302-03.

In *Contreras V*, as required by *Contreras IV*, the special master removed all evidence provided by Dr. Sladky and reweighed the remaining evidence which related to *Althen* prong three.  The expert opinions on this issue differed, and the scientific studies in the extensive record contained somewhat ambiguous evidence

---

[7]/  This, too, is harmless error, because petitioner needed to prevail on all three *Althen* prongs to establish entitlement to compensation, and a special master may focus on just one *Althen* prong to deny entitlement.  *See, e.g., Hibbard*, 698 F.3d at 1364-65.

as to a medically-acceptable time-frame for the onset of TM, or of TM and GBS. The court finds, nonetheless, that the special master rationally weighed this evidence and rationally relied upon respondent's other expert, Dr. Whitton.

Dr. Whitton opined that twenty-four hours was too short a time for either TM or GBS to develop after vaccination, even if molecular mimicry had been triggered by Jessie's vaccinations. Dr. Whitton's opinion was buttressed by his persuasive analysis of numerous scientific articles. The special master carefully considered the views of opposing experts and the totality of the evidence, and concluded that

> Dr. Sladky's evidence added little to the [*Althen* prong three] analysis. Thus, eliminating the (meager) contributions from Dr. Sladky does not change the undersigned's view that the evidence is not close. The evidence preponderates in favor of finding that the minimal amount of time needed for molecular mimicry exceeds one day and is likely to be around five days.

Opin. at 51-52. Because Jessie's alleged vaccine injury did not occur within a medically-acceptable time-frame, the special master denied entitlement in this case.

The special master's alternative fact-finding as to *Althen* prong three which excluded Dr. Sladky's evidence contains no error of law or abuse of discretion. The special master applied the appropriate standard for establishing a proximate temporal relationship between a vaccine and a vaccine injury. Opin. at 51-52. As for the special master's evidentiary rulings, the court notes that special masters have broad discretion in determining the reliability of scientific evidence. *E.g.*, *Terran*, 195 F.3d at 1316. Under this standard, the court has examined the alternative *Althen* prong three analysis in *Contreras V*, which references and relies heavily on *Contreras III*, for any manifest error in the consideration of the evidence presented by the parties. There is no sign that the special master erroneously excluded petitioner's scientific evidence as unreliable.

Nor, in the court's view, is the special master's alternative ruling on *Althen* prong three arbitrary or capricious. It is important to note that the court's review

of the special master's weighing of the evidence is highly deferential.  *See, e.g.*, *Munn*, 970 F.2d at 870 ("This is a standard [of review] well understood to be the most deferential possible.") (citations omitted).  As long as the special master's findings of fact and conclusions regarding the preponderance of the evidence going to *Althen* prong three are reasonable, this court must sustain the special master's entitlement decision.  *See, e.g.*, *Broekelschen*, 618 F.3d at 1348 ("'[R]eversible error is "extremely difficult to demonstrate" if the special master "has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision."'" (quoting *Hines v. Sec'y of Health & Human Servs.*, 940 F.2d 1518, 1528 (Fed. Cir. 1991))) (alteration in original).  Under this highly deferential standard of review, the special master's alternative *Althen* prong three analysis, which is rational, survives review.

The court turns to petitioner's arguments in this regard.  Petitioner first invites the court to reweigh the record evidence as to the timing issue.  Pet'r's Mot. at 23-24.  This reviewing court "does not reweigh the factual evidence or assess whether the special master correctly evaluated the evidence, nor does it examine the probative value of the evidence."  *Porter*, 663 F.3d at 1254 (citations omitted).  Thus, the court must defer to the fact-finding role of the special master and cannot reconsider the expert opinions and other evidence cited by petitioner.

Second, petitioner attacks Dr. Whitton, whose opinion was persuasive on the timing issue.  None of these criticisms of Dr. Whitton's expertise, opinions or credibility renders the special master's reliance on Dr. Whitton's opinions arbitrary or capricious.  Although Dr. Whitton may not have been the ideal expert in every respect, the court finds that the special master's reliance on Dr. Whitton's opinions was rational.  In addition, although petitioner attempts to portray Dr. Whitton as applying an inappropriate "scientific certainty" standard when rendering his opinions, Pet'r's Mot. at 24-25, it is clear that the special master applied the correct preponderance standard to the parties' evidence which related to *Althen* prong three.  Under the highly deferential standard of review that applies here, the court finds nothing arbitrary or capricious in the special master's alternative ruling on *Althen* prong three.

## CONCLUSION

For the above-stated reasons, the court sustains the entitlement decision of

the special master which did not rely on the evidence of Dr. Sladky.  Accordingly, it is hereby **ORDERED** that

(1)   Petitioner's Motion for Review, filed November 21, 2014, is **DENIED**;

(2)   The decision of the special master, filed October 24, 2014, is **SUSTAINED**;

(3)   The Clerk's Office is directed to **ENTER** final judgment in accordance with the special master's decision of October 24, 2014; and

(4)   The parties shall separately **FILE** any proposed redactions to this opinion, with the text to be redacted clearly marked out or otherwise indicated in brackets, on or before **May 1, 2015**.


/s/Lynn J. Bush_____
LYNN J. BUSH
Senior Judge